IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| PAULA KINGMAN and CALVIN KINGMAN, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 06-0907-CV-W-HFS |
| DILLARD'S, INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

The following is an adaptation of a memorandum I prepared shortly after testimony was completed in January. For better understanding of the rationale in this largely fact-governed case some legal issues are dealt with in the body of the memorandum. A limited number of legal conclusions are separated out at the end, pursuant to Rule 52(a)(1), F.R. Civ. Proc.

This is a very unusual case where the wife-caregiver (Paula) for her quadriplegic husband (Calvin) allegedly suffered a damaged shoulder at Dillard's when a high-hanging rack of apparel fell on her and caused her to twist violently backward to avoid the clothing and the bar on which they were hanging. Although she and her husband have been extremely accident prone, there is history and medical evidence that she has suffered painful and permanent shoulder injury that is not curable after three operations, and was substantially disabled from heavy work with her 250-300 lb. husband (she herself currently outweighs him). Both are in their late 40s, and he has survived his condition remarkably well for over 20 years with her home care, supplemented by family and neighbors and a hoist – and more recently by limited caregivers. Her claim is largely for a lifetime of pain and need for such things as medication, while his claim is for substitute caregiver help for

his lifetime, a form of spousal loss.

Given current expenses of home care, Calvin's claim for time needed for outside substitutes during the next twenty plus years approaches $1.7 million, while Paula's claim is comparatively modest, perhaps 1/4 of his. For reasons stated I am finding the facts for plaintiffs and granting a large portion of the relief asked, although I reject the husband's lifetime care claim, because I conclude that without the event at Dillard's, Paula's physical ability to handle Calvin's care would probably phase out in her early sixties.

Dillard's has some basis to treat this as a very suspect case, as it does, with considerable hostility, but after due consideration I conclude it is surprisingly credible.

LIABILITY

Dillard's has no testimony seriously or credibly disputing plaintiffs' version of what happened at Dillard's on Nov. 14, 2004. It seems fairly obvious, from witnesses and photographs – although Paula acknowledges she does not know exactly what happened – that she must have reached up into the apparel, probably to check sizes or prices, and likely did some normal tugging (no comparative fault is pursued). I am satisfied that the metal bar came down with a pile of clothing and she reached violently back to protect her face or at least avoid being buried in clothing. The rack apparently hit her sharply and heavily in the right shoulder; another likely source of permanent injury may have been the twisted shoulder – which now "pops" frequently and causes pain.

The cause of the loose fixture seems extraordinary to me. Pictures were taken by friends of plaintiffs and although the bar has screw holes there are no wall marks showing it was fastened. Instead, the clothing racks were "tucked" into slots in a wooden wall. This is now conceded. Maybe

2

the rack was overloaded but primarily the problem is that it was unattached. Dillard's considered this "safe" because several employees believe there were no other known incidents. The picture suggests, but I cannot reliably find, that the rack below the one in question may also have fallen. Company maintenance people were in charge, so the fault can't be attributed to outside people and Dillard's does not do so. Dillard's continues to claim the unattached racks were safely mounted – which seems ridiculous under the facts. What I see as holes for screws were hardly fabricated for aesthetic purposes.[1] This form of mounting seems inherently unstable. It is conceivable that the Dillard's people somehow mounted this particular rack with a fragile connection – but either way there is fault.

No accident report was written up, probably because Dillard's personnel did not think there was serious harm. Paula may have said "I'm ok" (probably meaning nothing drastic) but she developed pain and went to a clinic, where medication was prescribed and a sling was used. The next Dillard's knew was service of process a couple of years later – a year after filing suit.[2] There has been motion practice over liability theories which I will not review in detail. Because falling clothes racks in a store allows an inference of negligence, I think plaintiffs can prevail under a res ipsa loquitur theory. Neither other customers nor Paula seem to have been at fault in causing this occurrence. She had no reason to suppose that the rack was not so firmly attached that pulling on

---

[1] A prototype of the fixture involved is listed on both exhibit lists, and was produced by Dillard's, but neither offered it in evidence, although the transcript will doubtless contain a description. It is in evidence as Court's Exhibit 1. I suppose plaintiffs made no offer because it is lighter and smaller than Paula remembers and Dillard's recognizes now that demonstrating her error of recollection pales in significance when the unused screw holes are considered.

[2] The delayed prosecution seems related to concurrent litigation over a whiplash (rear end collision) from 2002, where there was neck injury and apparently occasional nerve pains – not muscular pains – in the shoulder region.

clothing – as anticipated – would cause everything to tumble on her. A specific theory of negligence also seems obvious from the testimony in the failure to firmly attach the fixture.

I therefore conclude that Dillard's is liable for any damages suffered as a result of its negligence. As I noted during trial, the common sense of the situation would be that in the vast majority of cases the harm would be nominal, as Dillard's supposed, and Paula herself apparently immediately supposed.[3]

## PAULA'S DAMAGE CLAIM

Dillard's claims Paula had a bad shoulder for years and that this incident did no further harm for which it is responsible. It fails to take into account the eggshell theory for predisposition, under which the plaintiff's misfortune becomes "the tortfeasor's bad luck." Schmude v. Tricam Industries, Inc., 556 F.3d 624, 628 (7th Cir. 2009) (Posner, J.). In the early 1990s there was a shoulder injury. A medical record states she could expect trouble later in life. More than a decade passed, however, and at most it seems there was predisposition, for which I think Dillard's is responsible. In 2002 there was a neck injury in a whiplash with some arm and shoulder pain, which plaintiff's witness, Dr. Swaim, treats as a nerve problem and not a structural issue for the shoulder muscles – similar to leg pains from a bad back. The Dillard's incident thus seems the cause of generally constant shoulder muscle problems from 2004. There is one mysterious entry by Paula in a record indicating a shoulder problem beginning in May 2003 (not Nov. 2004). That may be a mistake in her dating

---

[3]Consistent with the hypercritical attitude evidenced by Dillard's defense, there seems to be a theory that Paula falsely testified she was shrieking with pain from the outset. That is not what I heard, which demonstrates that memories are not very trustworthy – not necessarily that someone is lying. I understood she probably called out for help when it seemed she was being buried in clothing. Incidentally, the falling clothes may have provided protection from bruising or laceration even though she was struck with considerable force.

4

or a recurrence of the "nerve" issue from 2002 – or a minor warning of what happened at Dillard's. Still another defense theory would be that caregiving with a hoist caused the shoulder problem and the focus on Dillard's is contrived. I conclude that the medical records have a pattern that supports the focus urged by plaintiffs. To a considerable extent the medical records and trial testimony are dependent on Paula's credibility. She was a better than average witness and I do not believe she was falsifying information given to the doctors. Although I need to determine credibility for myself, it is of interest that Dr. Reardon, who performed two unsuccessful surgeries on her shoulder, described her, in undesignated portions of his deposition, as "straightforward and honest and reliable." Reardon Deposition (Doc. 202), page 127. She and her husband seemed so to me, as was also true of Dr. Swaim. I am also in general agreement with the recitations in Plaintiffs' Post Trial Brief (Doc. 195).

An embarrassment for Paula's claim is that the whiplash claim was settled for $25,000 (the full insurance coverage) on documents from a friend saying that Paula's body is a mess (from the whiplash?) and her current lawyer's claim that the whiplash and ensuing spells of dizziness and headaches are "disabling". If there was overclaiming by sympathetic advocates I do not think this has much effect on the current claim, other than to show need to review it with some degree of skepticism and caution.

Dillard's claims there was a mysterious second injury from use of crutches after a broken foot. This is speculative on the present record. There is also plaintiffs' testimony that the shoulder was painfully frozen when Paula reached back to her husband with something to drink while in the car. This seems consistent with a bad shoulder most currently dating to the Dillard's accident, and is unrelated to the neck injury although possibly remotely associated with the much older shoulder

5

problem, aggravated at Dillard's.

I conclude that Paula's shoulder pain medication costs and medical service for life are recoverable and also an allowance for shoulder pain for life. The shoulder keeps "popping" out and resettling, which is alarming to her, and the pain needs assessment. The caselaw also allows something more for the disability itself, largely directed toward limiting her ability to help her husband. That is her personal noneconomic loss, as distinguished from his loss of his wife's services. There is a claim for possible future surgery but that probably is too speculative to allow – the doctors have said there is nothing to be done after trying three times to alleviate pain by surgery. It is now agreed that Paula's condition is not susceptible to surgery.[4] I am also unable to make an assessment for either plaintiff for reduced sexual activity.

As to the amount of damages recoverable by Paula, I find that the following items have been established as being reasonably accurate and that causation, which is the most seriously disputed issue, has also been established.

(1) past medical expenses attributable to the Dillard's injury and to efforts to alleviate it: $66,388

(2) future medication and medical services: $50,000

(3) pain and disability of shoulder use: $70,000

    Total for Paula: $186,388

## CALVIN'S DAMAGE CLAIM

---

[4]The disconnected and somewhat inconsistent deposition opinions and comments of an unsuccessful surgeon are not currently persuasive. If this were a bone spur problem surgery would have been successful. Whether the defense might have been strengthened by one or more live witnesses persuasively tracing Paula's physical problems to something other than the events relied on by plaintiffs and Dr. Swaim is a moot point.

This is the big ticket issue. Even one caregiver for an eight-hour day (in two segments) at perhaps $20 per hour for over 5,000 days adds up. I opined early that a discount to present value was probably needed, but I will disregard that on the theory that health care costs are likely to rise as fast as interest rates (given the current low rates) and an adjustment can't be calculated. I also opined that Calvin's lifetime is not the test, or even their joint lives, because I doubt Paula could have been expected to engage in heavy moving until she drops. I am therefore persuaded to allow him 15 years, until she is 62.[5] The plan presented calls for two caregivers, because that is a safety rule in the profession, which is a consideration, although apparently Paula was doing the work of two (with a hoist). There has been help from family and neighbors, so I need to limit recovery to what is a substitute for her help. But once liability is established some liberality in estimating damages is permitted in order to prevent a tortfeasor from gaining a windfall from overly demanding judicial rules. Personal injury as such requires a common sense evaluation by the factfinder, within a wide range of reason. Even the economic future cannot be predicted with precision.

The main proponent of the caregiver plan was rather less credible than the other witnesses in that he seemed too much of a salesman, although he has testified frequently and has not been rejected under Daubert.[6] I have little doubt I should find that Calvin's life expectancy would exceed 15 years, and therefore is not an issue limiting recovery. Somehow the plaintiffs obtained hospice care for a period, but Calvin is clearly not in a dying condition. He has had bed sores occasionally, but less than might be expected, and has had less danger of pneumonia than might be expected. He

---

[5]Calvin's claim for future service under a Life Care Plan is arguably too modest in not seeking pre-trial reimbursement.

[6]I reject Daubert objections to the two plan preparers. They were qualified and helpful, even though the proof was far from perfect.

looks to be in fat and rosy health (diabetes excepted). He seems remarkably better than one might otherwise suppose, knowing he has been cared for by family for some 25 years.

Dillard's is relying on a bar to "double recovery". Future caregiver service was a major item sought in Calvin's claim for the accident that left him a quadriplegic.[7] This theory would be an affirmative defense. <u>Ozark Air Lines v. Valley Oil Co., LLC</u>, 239 S.W.2d 140 (Mo. App. W.D. 2007). It is speculative how much Calvin got for caregivers, and how much might be fairly claimed as a credit. His current claim for loss of consortium is quite different from his personal injury claim. Even if one supposed he was allocated $500,000 for caregiver service out of the settlement, that would not have been adequate for the 20 years plus already survived, if one does not give credit to Dillard's for volunteered family assistance. The rule is to prevent being in a "better condition" than if the original wrong had not occurred. 239 S.W.2d at 147. Thus a double recovery defense seems inapplicable, and to allow a credit would violate the strong principle against giving credit for collateral source assistance.

Dillard's makes a belated claim that pretrial disclosures were inadequate. The factual basis is unclear. No prejudice was evident at trial. In this court-tried case a brief recess was available but was not requested.

As to the amount of damages recoverable by Calvin, I find that caregiver replacement cost, as loss of services of Paula attributable to the Dillard's injury, for a 15 year period prior to Paula's 62nd birthday, (claimed in the amount of $1,660,239 as damages for his lifetime), has been established in the reasonable amount of $1,000,000. In particular, I reject the contention that Paula's

---

[7]I understood the settlement was for about $1.5 million, including attorney fees and including damages for a lifetime as a total invalid. The settlement agreement released claims for caregivers, but of course that was a bar against claiming against the original defendant(s).

reduced services after the Dillard's incident is directly attributable to her first shoulder injury many years ago, the neck injury from the whiplash accident, or general overexertion during Calvin's lengthy dependence on her, and that any contributing causation from earlier events, which is speculative, is the responsibility of Dillard's under the theory of predisposition.

LEGAL CONCLUSIONS

The injury to Paula Kingman from being struck by a rack of clothing at Dillard's was caused by the negligence of Dillard's, determined by res ipsa loquitur analysis and by specific negligence in failure to adequately anchor the rack to the wall.

Even if Paula Kingman was predisposed to injury in her right shoulder, I am satisfied that Missouri law, consistent with common law rules generally, requires the tortfeasor to compensate her for resulting injury. Simon v. S. S. Kresge Co., 103 S.W.2d 523, 527 (Mo. App. 1937). See Jenson v. Eveleth Taconite Corp., (8th Cir. 1997); Freeman v. Busch, (8th Cir. 2003).

The unusual extent of injury to Paula Kingman and the unusual dependence of Calvin Kingman on her services as his wife, requiring much higher damages than would ordinarily be imposed were well within the proximate causation concepts. Extraordinarily unpredictable injury, as arguably occurred in the Palsgraf case (162 N.E. 99 (N.Y. 1928)) did not occur here. Plaintiffs are not bound by the concepts of Hadley v. Baxendale, which are applicable to consensual contract cases. Tippin v. Western Union Telegraph Co., 185 S.W. 539 (Mo. App. 1916). See also Gladden v. Missouri Public Service Co., 277 S.W.2d 510 (Mo. 1955), where recovery was had for not protecting against a tree climber who was seeking to retrieve a parakeet. The specifics of danger need not be predictable.

Calvin Kingman is entitled to recover for loss of his wife's services to him as a quadriplegic.

Doc. 134, pp. 4-5.

Calvin Kingman is not barred by double recovery concepts because he had previously recovered a comparatively inadequate compromise sum many years ago which was probably measured in part by caregiving needs as a quadriplegic.

Plaintiffs' expert witnesses were qualified and adequately prepared to testify as they did, with sufficient information to offer conclusions, subject to cross-examination.

The Life Care Plan was not shown to have been disclosed to defendant too late to allow adequate study and cross-examination; and to the extent that defendant was surprised it failed to seek a recess in the trial, which would have been available if reasonably needed.

It is therefore ORDERED that judgment be entered against defendant and in favor of Paula Kingman in the amount of $186,388, and in favor of Calvin Kingman in the amount of $1,000,000.

/s/ Howard F. Sachs  
HOWARD F. SACHS  
UNITED STATES DISTRICT JUDGE

July  7 , 2010

Kansas City, Missouri